IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 12 |
| BRETT M. SHULISTA and | ) | |
| PATRICIA A. SHULISTA, | ) | |
| Debtors. | ) | Bankruptcy No. 10-00019 |
| ---------------------------------------------- | | |
| | ) | |
| WELLS FARGO BANK, N.A., | ) | Adversary No. 10-09032 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TAMA BENTON COOPERATIVE; | ) | |
| INTERSTATE GRAIN, | ) | |
| Defendants. | ) | |

**RULING ON THE MOTION OF WELLS FARGO BANK, N.A. AND CROSS-MOTION
OF INTERSTATE GRAIN FOR SUMMARY JUDGMENT**

This matter came before the Court on the Motion of Plaintiff Wells Fargo Bank, N.A. for

Summary Judgment. Defendant Batcheler Enterprizes, Inc. d/b/a Interstate Grain Service filed a

Resistance and Cross-Motion for Summary Judgment. The Court held a telephonic hearing on

November 19, 2010. Wells Fargo Bank, N.A. ("Wells Fargo") was represented by G. Mark Rice.

Batcheler Enterprizes, Inc. d/b/a Interstate Grain Services ("Interstate Grain") was represented by

Jeffrey P. Taylor. Defendant Tama Benton Cooperative did not participate. After hearing

arguments of counsel, the Court took the matter under advisement. This is a core proceeding under

28 U.S.C. § 157(b)(2)(A), (K), and (O).

**STATEMENT OF THE CASE**

This Court previously ordered a sale of livestock that has been the subject of disputes about

ownership between creditors in this case and the related HighSide Pork, LLC bankruptcy case.

Two creditors in this case, Wells Fargo and Interstate Grain, claim competing interests in the

livestock sale proceeds. In Cross Motions for Summary Judgment, the parties seek an

interpretation of Iowa Code § 570A.4 which governs the lien priority of an agricultural supply

dealer. The interpretation of that Code section will determine the relative priority of these parties

to the sale proceeds. Wells Fargo argues Interstate Grain has a priority limited to the $51,365.04 in

feed it sold in the 31 days before Interstate Grain filed its financing statement. Interstate Grain

asserts it has a superior priority to Wells Fargo for $70,599.50 of the proceeds and equal priority

for $22,542.42.

The Court resolves this complicated issue by applying the plain meaning of Iowa Code

§570A.4 and concludes that Interstate Grain has a perfected lien limited to $51,365.04. The Court

does not resolve the issue of priority in the remaining livestock sale proceeds.   That issue will be

set for hearing.

**PROCEDURAL AND FACTUAL BACKGROUND**

**a. Factual Background**

The parties agree on the material facts. The Shulistas are in the hog business both

individually and through their ownership of another corporation, HighSide Pork, LLC

("HighSide"). HighSide is a limited liability company they formed to produce SEW (Special Early

Wean) pigs. The Shulistas are the sole members of, and control HighSide. The Shulistas filed for

Chapter 12 bankruptcy on January 8, 2010 (Case No. 10-00019). HighSide separately filed a

Chapter 12 bankruptcy on the same date (Case No. 10-00020). Both the Shulistas and HighSide

were involved in some aspects of the hog operation. They both owned pigs and hogs at various

times. Ownership of the animals routinely shifted between the two.

2

When HighSide and the Shulistas filed their respective bankruptcy cases, there was

uncertainty about which of them owned the livestock at that time (the "Pigs"). To complicate

matters, the Pigs were being fed by nine different custom growers in Delaware, Linn, and Benton

County, Iowa.

HighSide and the Shulistas both filed expedited motions to sell the Pigs on the first day of

their bankruptcy cases. The Court authorized them to market and sell 5,002 head of feeder pigs.

The Order stated that "the liens of all parties claiming an interest in pigs [with the exception of the

custom growers' liens not at issue here] shall attach to the proceeds in the same manner and

fashion as if the [P]igs had not been sold and with the same priority as if the [P]igs had not been

sold." Order Approving Motion to Sell Free and Clear of Liens Except the Liens of Custom

Growers Under Iowa Code §579B at 2, Case No. 10-00019, ECF No. 13. The Court required the

proceeds from the sale to be held in a separate account pending resolution of the question of who is

entitled to the proceeds.

In a ruling in the HighSide bankruptcy (Case No. 10-09031), filed concurrently with the

Ruling here, this Court resolved the ownership issue. The Court ruled that the Pigs were the

property of the Shulistas—and not HighSide—at the time of the bankruptcy filings. As such, the

sale proceeds are the property of the Shulistas' bankruptcy estate for distribution to the Shulistas'

creditors. The proceeds from the sale totaled $250,671.50. The proceeds are currently being held

in escrow by the Shulistas' counsel. Both Interstate Grain and Wells Fargo claim an interest in the

sale proceeds.

The undisputed facts giving rise to the priority issues in this case are as follows. The

Shulistas individually executed four promissory notes (collectively, "Notes") in favor of Wells

3

Fargo. They also executed a security agreement in favor of Wells Fargo. The security agreement grants Wells Fargo a security interest in the Shulistas' livestock, other property, and all proceeds thereof. On October 13, 1998, Wells Fargo perfected its security interest by filing a UCC Financing Statement with the Iowa Secretary of State. Wells Fargo made the necessary filings to properly continue the Financing Statement.

Interstate Grain provided feed for the Shulistas' hog operation. As required by Iowa Code § 570A.2, Interstate Grain sent a certified request for financial information about the Shulistas to Wells Fargo before selling feed. Wells Fargo failed to respond to Interstate Grain's certified request.

From November 6, 2009 through January 8, 2010, Interstate Grain sold $93,141.42 in feed to the Shulistas. Of that total, the Shulistas purchased $51,365.04 of the feed in the 31-day period from November 6, 2009 to December 7, 2009. On December 7, 2009, Interstate Grain filed a financing statement with the Iowa Secretary of State to perfect its lien. The Shulistas are listed on the financing statement as the debtor. The collateral description includes all hogs owned by the Shulistas and proceeds thereof. Interstate Grain filed no additional financing statements.

Wells Fargo has filed a Proof of Claim in both the Shulista bankruptcy case and the HighSide bankruptcy case (where it is also a creditor). Each Proof of Claim is in the amount of $579,372.05. This represents the total amount due under the Notes as of the Petition date. Interstate Grain has filed a claim in the Shulista bankruptcy asserting an agricultural supply dealer lien of $93,141.42 in the sale proceeds.

Wells Fargo brought this adversary proceeding against Interstate Grain and another Shulista creditor, Tama Benton Cooperative. Wells Fargo seeks a determination of the extent and

priority of the Defendants' liens. Wells Fargo and Tama Benton Cooperative agreed to an Order to deal with Tama Benton's interest in the sale proceeds. This adversary case proceeds solely to determine the priority of the claims of Wells Fargo and Interstate Grain.

### b. Summary Judgment Filings and Arguments

On October 11, 2010, Wells Fargo moved for summary judgment. Wells Fargo argues that Iowa Code §§ 570A.4 & 570A.5 limit Interstate Grain to a superior perfected supply dealer lien of $51,365.04. This amount, according to Wells Fargo, covers only the feed sold to the Shulistas in the 31-day period from November 6, 2009 through December 7, 2009. Wells Fargo argues its own prior-perfected security interest is superior to the remainder of Interstate Grain's $41,776.38 unperfected lien for the remaining feed Interstate Grain supplied. Wells Fargo argues it has first priority in the remaining $199,306.46 of sale proceeds ($250,671.50 less Interstate Grain's superior perfected portion of its lien, $51,365.04).

Interstate Grain argues for a different reading of Iowa Code § 570A.4. Interstate Grain believes that its single filing at the end of the first 31-day period that it sold feed perfected its interest on a continuing basis for all feed it sold to the Shulistas. Interstate Grain argues § 570A.4 is ambiguous regarding the need for additional filings and the Court must evaluate the Code language using a broader practical and historical context. It argues that Wells Fargo's plain-meaning construction would lead to absurd results, including unnecessary multiple filing fees and repeated expensive requests by suppliers for updated financial information from banks. It argues that a requirement of multiple filings runs contrary to the core principle of notice underlying the central filing system. It further argues that Wells Fargo's plain-meaning approach would render a portion of the Iowa UCC addressing agricultural liens meaningless. It also makes

5

equitable arguments that it supplied feed to Wells Fargo's collateral and Wells Fargo should not be allowed to both trump Interstate Grain's lien and benefit from the feed supply.

Based on its interpretation of § 570A.4, Interstate Grain argues that the portion of its secured claim superior to that of Wells Fargo is $70,599.50. It argues it is perfected under § 570A.4 for the total value of feed supplied, $93,141.42. It contends that Iowa Code § 570A.5(3) determines its priority when an agricultural supplier and a lender are both perfected in the collateral. Under the § 570A.5(3) formula, Interstate Grain has priority for the value the feed contributed as an input to the livestock's market value. Interstate Grain argues that value is $70,599.20. It asserts the remaining $22,542.42 of its perfected lien is equal in priority to Wells Fargo's $579,372.05 security interest under Iowa Code § 570A.5(2). As a result, Interstate Grain contends the parties must share pro rata in the remaining sale proceeds after deducting Interstate Grain's $70,599.50 priority interest.

## CONCLUSIONS OF LAW

### a.  Summary Judgment Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056 (adopting Fed. R. Civ. P. 56(c)(2)). Wells Fargo and Interstate Grain agree that there is no genuine issue of material fact and this case can be decided as a matter of law by interpreting the Agricultural Supply Dealer Lien, Iowa Code Chapter 570A. This Court will take much of its guidance in making this interpretation from another case recently decided in this district interpreting Chapter 570A. In re Crooked Creek Corp., 427 B.R. 500, 502 (Bankr. N.D. Iowa 2010).

6

### b. Statutory Interpretation

"[T]he Supreme Court of Iowa has ultimate autonomy in interpreting the laws of [the State of Iowa], and we are bound by its interpretation." Wyldes v. Hundley, 69 F.3d 247, 253 (8th Cir. 1995) (citing Schleeper v. Groose, 36 F.3d 735, 737 (8th Cir. 1994)). "The goal in interpreting a statute is to determine and give effect to the legislature's intent." Crooked Creek, 427 B.R. at 505 (quoting Holiday Inns Franchising v. Branstad, 537 N.W.2d 724, 728 (Iowa 1995)). "[I]n order to ascertain the legislature's intent, we look to the spirit of the statute as well as the words and give a 'sensible, workable, practical, and logical construction.'" Id. "The interpretation of a statute requires an assessment of the statute in its entirety, not just isolated words or phrases." Crooked Creek, 427 B.R. at 505 (quoting Schadendorf v. Snap-On Tools Corp., 757 N.W.2d 330, 337 (Iowa 2008)). A court should interpret a statute so that no part of it is made irrelevant or superfluous. Id. The court should not construe a statute in a way that would produce impractical or absurd results. Crooked Creek, 427 B.R. at 505 (citing Carolan v. Hill, 553 N.W.2d 882, 887 (Iowa 1996)). The court should not speculate as to the probable legislative intent apart from the wording used in the statute. Id.

"Iowa courts look beyond the statute's express terms only when the language is ambiguous. A statute . . . is ambiguous if reasonable minds could differ or be uncertain as to the meaning of the statute. Language that is 'plain, clear, and susceptible to only one meaning' is unambiguous." In re Western Iowa Limestone, Inc., 538 F.3d 858, 863 (8th Cir. 2008) (citing City of Waterloo v. Bainbridge, 749 N.W.2d 245, 248 (Iowa 2008)).

"When the legislature amends a statute, we generally presume it intended to change the statute's meaning." City of Asbury v. Iowa City Development Bd., 723 N.W.2d 188, 196 (Iowa

2006) (citing <u>Martin v. Waterloo Comm. Sch. Dist.</u>, 518 N.W.2d 381, 383 (Iowa 1994)).

"However, this presumption can be overcome by legislative history or by an explanation

accompanying the amendment." <u>Id.</u>

### c.  Iowa Code Chapter 570A: Agricultural Supply Dealer Lien

In <u>Crooked Creek</u>, this Court addressed many of the foundational statutory interpretation

issues that involve Chapter 570A. Judge Edmonds provided a detailed and thoughtful analysis of

the Agricultural Supply Dealer Lien and the statutory scheme into which it fits. <u>Crooked Creek</u>,

427 B.R. at 506–07. With respect to the overall place of Iowa Code Chapter 570A in the statutory

scheme, Judge Edmonds stated:

> There is no legislative history on the enactment of Chapter 570A
> (1984 Iowa Acts, Ch. 1072) or on subsequent amendments . . . . It
> appears that in attempting to deal with farm credit problems, the
> **legislature tried to strike a balance among the various
> stakeholders**—farmers financial institutions, agricultural supply
> dealers, and other lienholders, including the holders of statutory
> liens and creditors holding Article 9 security interests other than
> financial institutions. The statute does not treat the different
> stakeholders uniformly.

<u>Id.</u> at 506 (emphasis added).

Interstate Grain properly <u>acquired</u> a lien under the detailed scheme of Chapter 570A, which

is summarized as follows. The premise of the agricultural supplier lien system in Iowa is that a

supplier makes an informed decision about how much credit to extend based on information it is

entitled to receive from the other lenders dealing with the farmer. <u>Id.</u> at 506. Section 570A.2

creates a procedure for an agricultural supply dealer to request information about a farmer's

creditworthiness. Upon a supply dealer's request, a secured financial institution "shall issue" a

confidential memorandum to the dealer containing information about the farmer's

creditworthiness. Iowa Code § 570A.2(1) & (2); <u>Crooked Creek</u>, 427 B.R. at 506. If the

confidential information reasonably shows the farmer's lack of creditworthiness, and the supply

dealer later tries to enforce its lien, the Iowa Code gives the secured financial institution an

affirmative defense against the supply dealer and affords the financial institution "complete proof

of the superior priority" of its own lien. Iowa Code § 570A.2(3); <u>Crooked Creek</u>, 427 B.R. at 506.

If the confidential memorandum shows that the farmer has "sufficient net worth or a line of credit

to assure payment," then by operation of law the memo functions as an "irrevocable and

unconditional letter of credit to the benefit of the [dealer] **for a period of thirty days** following the

date on which the final payment is due for the amount of the purchase price that remains unpaid."

Iowa Code § 570A.2(1) (emphasis added); <u>Crooked Creek</u>, 427 B.R. at 506–07. With the farmer's

financial information in hand, and with a clear understanding of its future relative lien priority, the

dealer may then decide whether to extend the agricultural supply to the farmer. Iowa Code §

570A.2(2); <u>Crooked Creek</u>, 427 B.R. at 506.

      In <u>Crooked Creek</u>, the Court discussed what happens when a supply dealer fails to make

the information request under § 570A.2. 427 B.R. at 506–07. <u>See also</u> <u>In re Coastal Plains Pork,

LLC</u>, 438 B.R. 845 (Bankr. E.D.N.C. 2010) (interpreting Iowa's agricultural supply dealer lien

statute and holding no superior agricultural lien priority exists for supply dealers who fail to send a

§570A.2(3) information request to a prior-perfected bank before supplying feed to the farmer).

Here, unlike in <u>Crooked Creek</u>, Interstate Grain requested the Shulistas' financial information and

Wells Fargo did not timely respond. In such a situation the Iowa Code creates additional

protections for the dealer:

               If within four business days of receipt of [the dealer's] certified
               request a financial institution fails to issue a memorandum upon the

> request of an agricultural supply dealer and the request from the
> agricultural supply dealer was proper under subsection 1 . . . the
> agricultural supply dealer may decide to make the sale and <u>secure</u>
> the lien provided in section 570A.3.

Iowa Code § 570A.2(2) (emphasis added). The undisputed fact that Wells Fargo failed to respond

entitled Interstate Grain to sell feed and <u>secure</u> an <u>effective</u> supply dealer's lien under Iowa Code §

570A.2(2). The dispute is over the extent to which Interstate Grain's lien was perfected.

Iowa Code § 570A.4 specifies the method for an agricultural supply dealer to perfect the

lien it secures. That section states:

> <u>Except as provided in this section,</u> a financing statement filed to
> perfect an agricultural supply dealer lien shall be governed by
> chapter 554, article 9, part 5, in the same manner as any other
> financing statement.
>
> 1. The lien becomes effective at the time that the farmer purchases
> the agricultural supply.
>
> 2. <u>In order to perfect the lien, the agricultural supply dealer must file</u>
> a financing statement in the office of the secretary of state as
> provided in section 554.9308 <u>within thirty-one days after the date</u>
> <u>that the farmer purchases the agricultural supply.</u> The financing
> statement shall meet the requirements of section 554.9502,
> subsection 1, and include all applicable information described in
> section 554.9516. <u>Filing a financing statement as provided in this</u>
> <u>subsection satisfies all requirements for perfection of an agricultural</u>
> <u>lien as provided in chapter 554, article 9.</u>

Iowa Code § 570A.4 (emphasis added). Perfection is critically important here. An agricultural

supply dealer such as Interstate Grain may obtain "super priority" for its agricultural lien. <u>See</u>

<u>Great Western Bank v. Willmar Poultry Co.,</u> 780 N.W.2d 437, 443 (N.D. 2010) (North Dakota

agricultural supplier lien grants "super priority" where statutory requirements are met); <u>Stockman</u>

<u>Bank of Montana v. Mon-Kota, Inc.,</u> 180 P.3d 1125, 1134 (Mont. 2008) (same); 4 James J. White

& Robert S. Summers, Uniform Commercial Code § 30–9, at 75 (6th ed. 2010) (Uniform

Commercial Code grants "super priority" to a perfected agricultural lien if the statute creating the

lien so provides) (hereinafter "White and Summers"). This super priority results because

agricultural liens "are forms of purchase-money financing." <u>Production Credit Ass'n.</u>, 518 N.W.2d

at 344. "Like other purchase-money provisions, [Iowa courts] believe this statute must be applied

to maximize the protection given to the creditor who is actually financing the production of [the

livestock]." <u>Id.</u>

However, there are limits to obtaining the super-priority status. The key limit at issue here

is that the super priority is allowed under Iowa law only insofar as the supply dealer has <u>perfected</u>

its lien:

> Except as provided in this section, an agricultural supply dealer lien that is effective or perfected as provided in section 570A.4 shall be subject to the rules of priority as provided in section 554.9322. For <u>an agricultural supply dealer lien that is perfected</u> under section 570A.4, all of the following shall apply:
> . . .
>
> 2. Except as provided in section 570A.2, subsection 3, the lien shall have equal priority to a lien or security interest which is perfected prior to the time that the agricultural supply dealer lien is perfected.
> . . .
>
> 3. A lien in livestock feed <u>shall have priority over an earlier perfected lien or security interest</u> to the extent of the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches or the sale price of the livestock, whichever is greater.

Iowa Code § 570A.5 (emphasis added). Article 9 of Iowa's Uniform Commercial Code

specifically recognizes that "[a] **perfected** agricultural lien on collateral has priority over a

conflicting security interest in or agricultural lien on the same collateral **if the statute creating the**

**agricultural lien so provides**." Iowa Code § 554.9322(7) (emphasis added). The parties agree that

Wells Fargo's prior-perfected security interest is subordinated to the amount of Interstate Grain's

perfected agricultural supply dealer lien.

## ANALYSIS

Interstate Grain claims its lien was perfected under Iowa Code § 570A.4 for the entire

amount of the feed it sold from November 6, 2009 through January 8, 2010 (74 days). Interstate

Grain asserts that the financing statement covered the first 31-day period after sale and all future

sale and supply. It believes the filing, like UCC financing statements to perfect security interests,

provides for continuous perfection. Interstate Grain bases its argument in part on the historical

language of Iowa Code § 570A.4. The language previously contained in § 570A.4 required a

supplier to file a lien statement that included an itemized declaration of the agricultural supply

"which has been or may be furnished." The section provided that the lien statement shall include

"the last date through" which the dealer had agreed to furnish supply, and the name and address of

the farmer for whom supply "was furnished or may be furnished." Iowa Code § 570A.4 (1985)

(amended 2003). Interstate Grain concedes that when the legislature amended this section in 2003

to integrate agricultural liens into the Revised Article 9 filing system, the language about

agricultural supply that "has been or may be furnished" did not survive. Interstate Grain argues the

old language for the lien statement requirements was "inadvertently lost." It argues that the 2003

amendment was designed to change the perfection process to comport with the Iowa Uniform

Commercial Code, not to change the substantive scope of the lien. It also argues that a

plain-meaning analysis would nullify a portion of the Iowa UCC addressing agricultural liens.

Interstate Grain also argues it would simply be unfair and inequitable to allow Wells Fargo to have

12

any position in front of Interstate Grain because all feed Interstate Grain supplied went to Wells Fargo's collateral.

Wells Fargo claims Interstate Grain perfected only the amount of feed it sold the Shulistas in the 31-day time period before it filed its financing statement on December 7, 2009. Stated another way, Wells Fargo claims Interstate is not perfected for the value of feed sold after the date Interstate Grain filed its financing statement. Wells Fargo argues that the language Interstate Grain relies on for its continuing perfection argument was intentionally removed in the 2003 amendment. There is no specific Iowa case law addressing this question.

The critical issues in this case thus deal with both the perfection and priority of the Iowa agricultural supply dealer's lien. Both parties agree that Interstate Grain has a perfected agricultural supply dealer's lien that entitles it to some portion of the pig sale proceeds. They disagree about the extent to which Interstate Grain perfected its lien. This perfection issue has strong bearing on the priority of the parties in the proceeds. Both parties have thoroughly and effectively briefed these complicated and difficult issues. This is a question of first impression for the Court.

**1. Interstate Grain perfected only a portion of its agricultural supply dealer lien.**

Before selling feed to the Shulistas, Interstate Grain sent a certified request for a financial information memorandum to Wells Fargo under Iowa Code § 570A.2. Wells Fargo did not timely respond under Iowa Code § 570A.2(2). Because Wells Fargo did not timely respond, Interstate Grain was free to "make the sale and secure the lien provided in section 570A.3." Iowa Code § 570A.2(2).

13

Interstate Grain "secured" an agricultural supply dealer lien when it began selling feed to the Shulistas on November 6, 2009. Iowa Code § 570A.3. The amount of the lien Interstate Grain "secured" was the retail cost of the feed sold plus the value of labor provided to supply it. Iowa Code § 570A.3. The lien applied to the Shulistas' livestock (the pigs) that consumed the feed. Iowa Code § 570A.3(2). Under Iowa Code § 570A.4(1), the lien also became "effective" at the time the Shulistas purchased the feed. Wells Fargo thus admits Interstate Grain secured a lien that is "effective" for the full amount of the feed debt. Wells Fargo further admits Interstate Grain partially perfected its lien when it filed a financing statement in the office of the Iowa Secretary of State. Iowa Code § 554.9310(2).

The dispute here is whether Interstate Grain perfected only that portion of the lien that Wells Fargo admits, or the full lien amount Interstate Grain claims. As noted, this perfection question is critically important here because the agricultural supply dealer has priority over an earlier perfected lienholder only to the extent the agricultural supply dealer's lien is perfected. Iowa Code § 570A.5. The Court must answer this question by interpreting the following language of § 570A.4: "In order to perfect the lien, the agricultural supply dealer must file a financing statement in the office of the secretary of state as provided in section 554.9308 within thirty-one days after the date that the farmer purchases the agricultural supply." (emphasis added).

### a.  Plain Meaning of Statutory Language

The Court concludes the plain meaning of that statutory language specifies an agricultural supply dealer's lien is perfected for the amount of supply Debtors purchased from Interstate Grain within the discrete window of time stated in the statute.[1] The Court agrees with Wells Fargo that

---

[1]This direct application of the plain language of the Code is also consistent with the Northern District of Iowa's approach to interpreting a different issue arising under the agricultural supply dealer lien statute. In

the lien is perfected under § 570A.4 only for "the agricultural supply" that the farmer **purchased**

"within thirty-one days" before the dealer filed the financing statement. Under this analysis,

Interstate Grain's lien is perfected only for the $51,365.04 of feed it sold during the 31-day period

before filing its financing statement. The perfected lien does not continue on its own accord to

encompass future advances or amounts sold later. No statutory language or other authority

supports such a continuous and accumulating lien. If additional feed is sold after the first 31-day

period, another financing statement must be filed within 31 days of sale to perfect the lien on that

transaction.

### b. 2003 Amendment Changed the Statutory Language

The Court acknowledges that the previous language of Iowa Code § 570A.4 appears to

have allowed a perfected agricultural supply dealer lien to include future feed the supplier sold to

the farmer. That language previously required a supplier to file a verified lien statement that

included "an itemized declaration of the nature and retail cost of the agricultural chemical, seed,

feed, or petroleum product which has been or may be furnished pursuant to the certified request . .

. ." Iowa Code § 570A.4(1)(b) (1985) (amended 2003) (emphasis added). However, even in those

future supply situations, the "old" language of § 570A.4 shows the legislature intended for an

agricultural supply dealer lien to have a discrete—not open-ended—value. The Code also required

(and still requires) the supplier's "certified request" to "state the amount of the purchase [of

supply] and the terms of sale." Iowa Code § 570A.2 (emphasis added). Thus, while the 1985

---

Farmers Coop. Co. v. Swift Pork Co., the Northern District of Iowa interpreted Iowa law to ascertain the
proper statute of limitations within which a feed supplier could enforce its agricultural supply dealer lien.
602 F. Supp.2d 1095 (N.D. Iowa 2009). The court followed the Iowa Supreme Court's principles of
statutory interpretation, stating that because "the statutory language is plain and the meaning clear . . . the
court should not search for legislative intent beyond the express terms of the statute." Farmers Coop, 602 F.
Supp.2d at 1109 (citing State v. Public Employment Relations Bd., 744 N.W.2d 357, 360–61 (Iowa 2008)).

version of § 570A.4 allowed an agricultural supplier to perfect a lien to include feed it would

furnish post-filing, the filing had to identify the amount of feed that would be furnished and its

"retail cost." The language the legislature used never allowed an agricultural supply dealer to

perfect by filing a lien statement identifying one amount to be furnished and then later increase the

lien claim to include additional amounts it furnished after the financing filing.

Even if the previous statutory language did allow such a practice, the 2003 amendment to

section 570A.4 made clear the perfected lien is limited to a discrete time (31 days) in which a

definite value (the amount purchased) is established. The amended section now unambiguously

requires the supplier to perfect by filing a financing statement "within thirty-one days after the date

that the farmer **purchases** the agricultural supply." § 570A.4(2) (emphasis added). The language

of the statute shows the legislature intended for the supplier to have a lien for the amount of

agricultural supply the farmer purchased in the previous 31 days. It makes no provision for future

advances or purchases to be included in or considered to fall under that one financing statement

filing. The language chosen, however, does not limit the amount actually purchased—even if it

was for future periods. This is made clear by the legislature replacing the former language

referring to amounts furnished or to be furnished with the more readily quantifiable—but not

limited—sum of the amount purchased.

The Court's conclusions here are based in part on the fact that the 2003 amendment

specifically deleted the language that allowed the financing statement to cover feed that "may be"

furnished in the future. "When the legislature amends a statute, we generally presume it intended

to change the statute's meaning." City of Asbury, 723 N.W.2d at 196. As such, the Court must

presume that the legislature intended to change the statute's requirements to no longer allow a

16

supplier to perfect for feed that "may be furnished" in the future after filing. City of Asbury, 723 N.W.2d at 196. There was no accompanying legislative history to indicate otherwise. Crooked Creek, 427 B.R. at 505–06.

Interstate Grain argues that this particular amendment to the agricultural supply dealer lien statute in 2003 was not intended to alter dealer rights. Interstate Grain argues that the 2003 amendments were part of a broad action by the legislature to bring agricultural liens within the UCC. Interstate Grain asserts that the legislature intentionally removed the detail about how to file a "lien statement" from section 570.4, and instead referred to the general guidelines for filing UCC financing statements. Interstate Grain contends this future advance language from former section 570.4—"may be furnished"—was "inadvertently lost" or unintentionally removed in the process. As such, it asserts that the Court should not read it as altering the meaning of the statute.

Interstate Grain argues simply that the new, amended provision keeps the same coverage for future advances but now requires a financing statement under the UCC instead of the "lien statement" previously described. Such a financing statement under the Iowa UCC generally requires only the name of debtor, the name of the secured party or its representative, and an indication of the collateral covered. Iowa Code § 554.9502(1). Interstate Grain believes that the filing it made was sufficient under the Iowa UCC and continues to be effective for five years. Iowa Code § 554.9515. As such, Interstate Grain specifically asserts that the Code "allows a single financing statement to perfect future advances by Interstate Grain made within 5 years after the date of filing." Interstate Grain's Brief in Support of Cross Motion for Summary Judgment at 7, ECF No. 20.

17

###### c.  Limitations on Super-Priority Status

While the plain meaning of the statute and the language the legislature chose to eliminate are at odds with Interstate Grain's argument, the rationale for and underlying purpose of agricultural supply dealer liens are at odds with Interstate Grain's arguments as well. The agricultural supply dealer lien is described by several cases and a leading treatise as having "super priority" once perfected. Great Western Bank, 780 N.W.2d at 439; Stockman Bank of Montana v. AGSCO, Inc., 728 N.W.2d 142, 149 (N.D. 2007); White and Summers, § 30–9, at 75. This "super priority" allows one who perfected later in time to jump over a prior-perfected security interest. White and Summers, § 30–9, at 75. Because such a lien is contrary to the typical UCC policy of "first in time is first in right," most statutes place some limits on this "super priority" status. Id. One such common limit is to restrict the superior lien status to only the supplier that perfects its lien. Id.

Iowa's agricultural supply dealer lien law incorporates the principle limiting the lien's super priority. Iowa Code §§ 570A.4 & 5. Because a perfected agricultural supply dealer lien can trump a prior-perfected consensual security interest, the legislature has carefully limited the lien's value to a specific transaction—a purchase—within 31 days. Iowa Code § 570A.4. Courts strictly construe these statutory lien perfection requirements. See In re Bunker Exploration Co., 48 B.R. 708, 710 (Bankr. W.D. Okla. 1985) ("a lien [may not] be created out of a sense of fairness if the terms of the statutory lien are found too narrow and have not been met."); Williams v. Athletic Field, Inc., 228 P.3d 1297, 1301 (Wash. Ct. App. 2010) ("We strictly construe lien statutes because they are in derogation of the common law."). Strictly construed, this statute does not allow for perfection of future advances as Interstate Grain suggests.

18

### d.  Statutory Agricultural Liens and the Iowa UCC

Interstate Grain's arguments here encapsulate the tension between the agricultural supply

dealer lien scheme and Revised Article 9 (adopted in Iowa in 2001). Agricultural liens are created

by statute, not contractual security agreements. White and Summers, § 30-9, at 74-75. Like almost

all statutory liens, they were previously treated outside the UCC. Id. at 75. However, agricultural

liens are now (through 2001 amendments) included in the scope of Revised Article 9 of the Iowa

UCC. Iowa Code § 554.9109(1)(b). Agricultural liens, however, remain distinct from security

interests created by consensual security agreements. Iowa Code § 554.9102(1)(3). As such,

"agricultural liens are only partially incorporated into Article 9." Stockman Bank of Montana, 180

P.3d at 1134. For this reason, a leading treatise has noted that "the agricultural lien has one foot in

Article 9 and one foot outside of it." White & Summers, § 30–9, at 75. The method of creating and

perfecting agricultural liens often looks beyond Article 9 to the agricultural lien statute itself.

Similarly, the agricultural lien statute refers to and utilizes the Article 9 scheme except where it

notes otherwise.

That is the scheme Iowa has adopted. For example, § 570A.4 specifically states: "Except as

provided in this section, a financing statement filed to perfect an agricultural supply dealer lien

shall be government by Chapter 554, Article 9, Part 5 . . . ." (Emphasis added). Similarly, § 570A.5

states: "Except as provided in this section, an agricultural supply dealer lien that is effective or

perfected as provided in section 570A.4 shall be subject to the rules of priority as provided in

section 554.9322 . . . ." (Emphasis added). The UCC likewise refers back to the statutes creating

agricultural liens. "A perfected agricultural lien on collateral has priority over a conflicting

security interest in or agricultural lien on the same collateral if the statute creating the agricultural

19

lien so provides." Iowa Code § 554.9322(7) (emphasis added). While the practice of tying

perfection to a specific period of time following a specific event (here, a purchase) may be

somewhat atypical for measuring perfection under Article 9, it is a common method used for

statutory liens. See, e.g., Iowa Code § 571.3(2) (Harvester's lien perfected by filing "within ten

days after the last date that the harvesting services were rendered."); Iowa Code § 572.8

(Mechanic's lien perfected by filing 90 days after completion of work). This measurement of and

limitation on perfection appears to be exactly what was intended here in the legislature's treatment

of agricultural supply dealers liens under the lien statute and the UCC. The UCC rules are to apply

"except as provided" in Chapter 570A.

Interstate Grain has argued that limiting perfection to the purchase in the 31-day period

would improperly nullify part of § 554.9308(2) which states: "An agricultural lien is perfected

when it becomes effective . . . ." Interstate Grain asserts that this language contemplates the filing

of a financing statement (used to perfect) **before** the purchase (point when lien becomes effective).

Thus, Interstate Grain appears to argue that a financing statement must protect future purchases

because each time they occur, the lien would be "effective" and thus complete perfection.

Interstate Grain's interpretation, however, fails to account for the remainder of the sentence in

§ 554.9308(2) that it relies upon. That remaining portion of the sentence allows perfection when

effective only "if the applicable requirements [of perfection] are satisfied before the agricultural

lien becomes effective." Id. Again, this refers back to the interplay between the UCC provision and

the agricultural lien statute.

Section 570A.4 provides that "in order to perfect the lien, the agricultural supply dealer

must file a financing statement . . . within thirty-one days **after** the date that the farmer purchases

20

the agricultural supply." (emphasis added). Thus, the language of § 554.9308(2) Interstate Grain

points to cannot apply to this type of agricultural lien, because the "applicable requirements (of

perfection)" cannot be "satisfied **before** the agricultural lien became effective." (emphasis added).

Under its very terms, an agricultural supply dealer's lien can never be "perfected when [i.e., before

or at the same time] it becomes effective."

If a court is faced with apparent conflict in statutes, the court should "first attempt to

reconcile the two provisions." Citizens Aide/Ombudsman v. Miller, 543 N.W.2d 899, 903 (Iowa

1996) (citing Iowa Code § 4.7 as stating "if a general provision conflicts with a special or local

provision, they shall be construed, if possible, so that effect is given to both"). However, "[i]f the

conflict between the provisions is irreconcilable, the special or local provision prevails as an

exception to the general provision." Iowa Code § 4.7. See also Burton v. Univ. of Iowa Hospital &

Clinics, 566 N.W. 182, 189 (Iowa 1997) (citing same). To the extent the statutes are irreconcilable,

section 570A.4, amended in 2003, is a later and more specific statute containing comprehensive

perfection requirements. As such, the Court gives its terms priority over the general UCC

standards for perfecting an agricultural supply dealer's lien. Id.; see also U.S. v. Estate of Romani,

523 U.S. 517, 532 (1998) (in harmonizing Tax Lien Act and federal priority statute, the Court held

that later, more specific Tax Lien Act containing comprehensive provisions "represents

Congress's detailed judgment" on underlying question of when Government's claims for unpaid

taxes take priority over other perfected liens).

### e.  Multiple Filing Concerns

Interstate Grain argues that interpreting the language of § 570A.4 to require a financing

statement to be filed every 31 days to perfect a lien on a purchase of feed occurring within that time

would require multiple unnecessary UCC filings. It argues this is contrary to the spirit of UCC requirement that generally allows a single filing to perfect a lien right. Interstate Grain similarly asserts such a rule would also require repeated certified requests for financial information under § 570A.2. Interstate Grain believes an interpretation that would result in such additional filings and requests produces an "absurd" result and should not be adopted.

The plain meaning of § 570A.4 does not appear to require the additional filings about which Interstate Grain argues. Section 570A.4 requires a filing within 31 days of the purchase transaction. It would require more than one filing only if the dealer had more purchase transactions outside of the 31 day period with a farmer. It would not require additional filings if, for example, a single purchase transaction covered all of a farmer's feed needs for a five month supply period—like the period allegedly involved here. The statute only requires a financing statement to be filed within 31 days of the date of the purchase. It does not limit the amount of purchase or even the length of the supply period that is part of the purchase transaction. A single filing would suffice if the purchase covered all feed for the anticipated period of supply.

If the purchase covered only a month, and later purchases were needed to cover additional one-month periods, then additional filings would be needed. However, even then, the limited agricultural supply period (months not years) would tend to limit the amount of additional filings. The problem, however, appears to be avoidable by structuring a purchase to cover the anticipated supply period.

To the extent additional filings are necessary, however, does not produce "absurd" results as Interstate Grain argues. Rather, any increased filing burden could fairly be considered as a reasonable exchange for the super-priority status the filing helps to acquire. It is part of the

22

"balance" the legislature tried to strike between the "various stakeholders." <u>Crooked Creek</u>, 427

B.R. at 506. The dealer acquires a super-priority. The prior-perfected lender that is being

subordinated by the super priority has some limits placed on the erosion of its collateral position.

While the result may not be what a dealer would like, or perhaps even favor the lender more than it

needs to the legislature's choice was not absurd.

### f.  Future Advances Not Protected Under UCC Language

Interstate Grain also specifically argues that its one filing protects and perfects its rights

under the Iowa UCC to make "<u>future advances</u>." Interstate Grain's Brief at 7, ECF No. 20. While

Interstate Grain concedes the § 570A.4 language that appeared to allow specifically future

advances was at least "inadvertently lost" from § 570A.4 on amendment in 2003, Interstate Grain

also argues any future advances it made would be perfected under the Iowa UCC scheme. The

Iowa UCC however specifically addresses "future advances," and that provision does not appear

to support Interstate Grain's assertion. The provision states that a "<u>security agreement may provide</u>

<u>that collateral secures. . . future advances or other value . . .</u>" Iowa Code § 544.9204(3) (emphasis

added). There is no reference in the future advances provision that allows for its application to

agricultural liens. The statute limits protection for future advances to transactions involving

"security agreements." "Security agreements" are contractual agreements that produce "security

interests"—which as noted above differ from agricultural liens.

Interstate Grain does not argue that it has a security agreement. However, it points to the

"certified request" for information it made to Wells Fargo under § 570A.2 as having a similar

effect. In that request, Interstate Grain specifically stated it intended to provide feed "for five

months." It argues this clearly alerted Wells Fargo that it would be providing feed for the Pigs

(Wells Fargo's collateral) for a five-month period which would entail future advances. While this request may have given notice to Wells Fargo—and even peace of mind to Wells Fargo—that its collateral would get fed in the future, the law is clear that notice of financing is not a substitute for perfection. White and Summers, § 33-3 at 325.

### g. Other Cases Interpreting Similar Lien Statute

This interpretation of the Iowa agricultural supply dealer lien statute is also consistent with the interpretation one court provided of a somewhat similar North Dakota agricultural supply dealer lien statute. In re Bernstein 230 B.R. 144 (Bankr. D.N.D. 1999). In North Dakota, the procedure to obtain an agricultural supply dealer lien requires that the supplier, "within one hundred twenty days after the supplies are furnished or the services performed, shall file a verified statement in the office of the recorder of any county in this state or in the office of the secretary of state." N.D. Cent. Code § 35–31–02. In Bernstein, an agricultural supply dealer had continuously furnished supplies over a period of 340 days, and then filed a single lien statement at the end of the period. 230 B.R. at 148. The court held that the supplier was only entitled to superior agricultural supplier's lien priority for the value of supplies it provided during the specified 120-day window before supplier filed its verified statement. Id. at 153. The court specifically denied supplier's request for priority for the amount it furnished for the 220 days beyond the statutory 120-day look-back window. Id. at 153. The conclusion in Bernstein, like in this case, relied on a reading of the agricultural supply dealer lien statute that limited the agricultural supply dealer's lien to what occurred during the specific window of time the statute provided. In Iowa, the statute covers all purchases within a 31-day period. In North Dakota, the statute covers amounts actually furnished during a 120-day period. See also Stockman Bank v. AGSCO, 728 N.W.2d at 153–55 (agricultural

24

supplier lien in North Dakota limited to statutory "120-day window"). This Court's conclusion

that the Iowa statute limits perfection to what occurred during the 31-day period is consistent with

the conclusion in <u>Berstein</u>.

For all these reasons, the Court holds Iowa Code § 570A.4 limits Interstate Grain to a

perfected agricultural supply dealer lien for the value of feed it sold in the 31-day period before

filing its financing statement. Thus, Interstate Grain has a <u>perfected</u> agricultural supply dealer lien

limited in amount to the $51,365.04.

**2.  The Priority of Interstate Grain's Non-Perfected Lien for the Remaining Feed it Provided.**

Interstate Grain has a <u>perfected</u> agricultural supply dealer lien that is superior in priority to

Wells Fargo's lien for only $51,365.04. Interstate Grain holds an unperfected (but effective)

supply dealer lien in the remaining $41,776.38. That unperfected portion, however, undisputedly

represents the value of feed that went into and helped to preserve Wells Fargo's collateral. The

question that remains is the priority, if any, of Interstate Grain's unperfected agricultural supply

lien.

Wells Fargo argues that its security interest has priority over the entire unperfected portion

of Interstate Grain's lien. Wells Fargo argues that an agricultural supply dealer lien that is not

specifically addressed in § 570A.5 "shall be subject to the rules of priority as provided in section

554.9322." Iowa Code § 570A.5. Those Article 9 UCC priority rules in § 554.9322(1)(b) state the

general rule that "[a] perfected security interest or agricultural lien has <u>priority over</u> a conflicting

<u>unperfected</u> security interest or agricultural lien." (Emphasis added). Wells Fargo concludes that

under those rules, its prior-perfected security interest in the amount of $579,372.05 has superior

priority over the remaining $41,776.38 unperfected portion of Interstate Grain's agricultural

supply dealer lien.

Interstate Grain has largely argued the remaining priority issue from the perspective that it

is fully perfected. However, Interstate Grain also has argued that it stepped in and provided a

steady stream of feed to maintain the health of the livestock and it should be rewarded—not

penalized for its efforts. It argues that it would be "fundamentally unfair" for Wells Fargo to be

able to acquire a priority in front of Interstate Grain when its feed maintained or increased Wells

Fargo's collateral. Interstate Grain's Brief at 14. This is particularly true, if, as Interstate Grain

alleges, Wells Fargo had notice in the certified request that Interstate intended to supply feed for a

five month period—giving Wells Fargo assurance that its collateral would be properly maintained.

Interstate Grain makes what amounts to an argument for equitable relief from the Court. It

has essentially argued Wells Fargo was unjustly enriched if Wells Fargo can successfully argue

Interstate Grain failed to perfect its whole lien. In essence, Interstate argues it is fundamentally

unfair to allow Wells Fargo to attack its lien as technically not perfected, and then receive the value

of Interstate Grain's feed supply without paying for it. This would be especially true if Wells Fargo

did know that Interstate Grain would feed its collateral for the full five months.

While Interstate Grain has not requested any specific equitable relief, the only equitable

remedy available would be an equitable lien. An equitable lien is described in various ways under

Iowa law. One court summarized such a remedy as follows:

> equitable liens are generally recognized, [however] the doctrine is
> one of obscure definition. It has been said it is "difficult to give an
> accurate and comprehensive definition of the term equitable lien
> and, ... it frequently has been stated such a lien is a right not
> recognized at law, to have a fund or a specific property, or its

26

proceeds, applied in whole or in part to the payment of a particular
debt or class of debts."

Smith v. Village Enters., Inc., 208 N.W.2d 35, 38 (Iowa 1973)
(quoting 51 Am.Jur.2d Liens § 22 (1970)).
As we noted in Smith, the concept of equitable lien may cover many
varying factual situations. Smith, 208 N.W.2d at 38. The equitable
lien is said to be a restitution concept applied by courts of equity to
avoid injustice and particularly to avoid unjust enrichment.
Restatement of Restitution § 161 (1937). The lien may arise either
by the express contract of the parties or by implication under
equitable principles. In Farmers & Merchants Bank v.
Commissioner of Internal Revenue, 175 F.2d 846, 849 (8th
Cir.1949), the Court stated:

> An equitable lien arises either from either a written
> contract which shows an intention to charge some
> particular property with the debt or the obligation, or is
> implied and declared by a court of equity out of general
> considerations of a right and justice as applied to the
> relations of the parties and the circumstances of their
> dealings.

Tubbs v. United Central Bank, 451 N.W.2d 177, 185 (Iowa 1990). The court in Tubbs went on to

impose an equitable lien with a priority ahead of a perfected mortgage. Given the benefit Wells

Fargo received from all of the feed Interstate Grain provided, and the appearance that Wells Fargo

may have known it was getting the feed, an equitable lien of some fashion may be appropriate to

resolve the remaining priority issue.

Because the record has not been developed on this issue, and it has not been addressed by

the parties in argument, this matter will be set for hearing.

**WHEREFORE,** Plaintiff Wells Fargo, N.A.'s Motion for Summary Judgment is

GRANTED IN PART, and DENIED IN PART. The Motion is granted to the extent Wells Fargo

requested a ruling limiting the amount of Interstate Grain's perfected agricultural supply dealer's

27

lien to $51,365.04. The Motion is denied to the extent it requires a ruling that the remaining lien of

Interstate Grain is subordinate to Wells Fargo's security interest.

  **FURTHER,** Defendant Batcheler Enterprizes, Inc. d/b/a Interstate Grain Service's

Cross-Motion for Summary Judgment is DENIED.

  **FURTHER**, the hearing on the propriety of an equitable lien will be set by separate order.

  Dated and entered:
     April 19, 2011


                   _____
      THAD J. COLLINS
      CHIEF BANKRUPTCY JUDGE